Filed 11/6/20  Castro v. Bank of America, Nat. Assn. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| RITA CASTRO,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>BANK OF AMERICA, NATIONAL ASSOCIATION et al.,<br><br>      Defendants and Respondents. | B294396<br><br>(Los Angeles County<br>Super. Ct. No. BC664647) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Steven J. Kleifield, Judge.  Affirmed.

Law Offices of Victor L. George, Victor L. George, Wayne C. Smith and Elvis Tran; Esner, Chang & Boyer and Shea S. Murphy for Plaintiff and Appellant.

Davis Wright Tremaine, Camilo Echavarria, and Elizabeth J. Carroll for Defendants and Respondents.

## INTRODUCTION

In January 2017, respondent Bank of America, N.A. (the Bank) fired appellant Rita Castro, the Financial Center Manager of its Tarzana financial center, after concluding that Castro had abused and bullied employees at the financial center.  Castro subsequently sued the Bank, respondent Andrew Downes Ah Moo (her former supervisor), and respondent Brian Jones (her second-level supervisor).  The operative complaint claimed her termination was the result of impermissible discrimination based on her age, gender, and disability, and was retaliation for reporting improper sales practices.  The trial court granted respondents' motion for summary judgment, finding that while Castro had made a prima facie case for age discrimination and retaliation, she had made an insufficient showing to overcome the Bank's proffer of legitimate reasons for her termination.  On appeal, Castro challenges the court's ruling, arguing that the evidence she presented raised triable issues of material fact whether her termination resulted from impermissible discrimination or retaliation.  We affirm.

## STATEMENT OF RELEVANT FACTS

### A.    *Background*

Castro was born in November 1950 and has suffered from rheumatoid arthritis (RA) since approximately 2005. Prior to her termination in January 2017, she had been

2

employed by the Bank for over 30 years. Starting in 2010, she managed the Bank's financial center in Tarzana, holding the title of Financial Center Manager (FCM). She was an at-will employee.

Castro underwent multiple surgeries while employed by the Bank. In 2011, she had rotator cuff surgery. In 2014, she had surgery on her left foot. In 2015, she had another surgery on her left foot. She also had both knees replaced at different times. For each surgery, she either took medical leave or elected to use her vacation time.[1] Castro expressed no concerns with how the Bank handled her time off for surgeries.

Because of Castro's RA, she had trouble using an iPad that employees used to help direct customers who entered the financial center. When customers entered the lobby, an employee would ask for their name or debit card and enter this into an iPad the employee was holding. The iPad would display the customer's history and accounts with the Bank, helping the employee direct the customer to whomever could assist them. Castro had trouble holding the iPad, so when she was directing customer traffic, she would instead go to her computer to input the customer's name or debit card, and direct the customer thereafter. Castro was not required to be the employee directing customer traffic; as the FCM, she had the authority to delegate the task to others.

---

[1] Castro testified that using vacation time to undergo surgery was her decision, not one requested by the Bank.

3

From August 2015 to July 2016, respondent Andrew Downes Ah Moo (Downes) supervised several banking centers, including the one in Tarzana. While his office was not located in the Tarzana center, Downes was Castro's supervisor. During the period he supervised her, she claims he made the following comments to her:

–He asked whether she wanted to transfer to a smaller branch because she was "'getting older and it might be easier.'"

–When Castro stated she did not remember a certain customer, he asked her, "'What's wrong with your memory?'"

–He commented she would be carried out of the Bank "'feet first.'"

–He asked why she could not get along with millennials.

–He asked why she was not using the iPad.

–He asked, "'How many more surgeries can you have?'" and once said, "'Come here, gimpy'" when she was limping.[2]

---

[2] Castro testified at deposition that she did not hold the "gimpy" comment against Downes and thought Downes might be joking.

Castro claimed that after Downes began supervising her in 2015, she was "marginalized." She was no longer invited to town hall meetings or "roundtables," where six to eight managers in a region would be asked to meet with senior managers. She also stopped receiving perks, such as tickets to baseball games or concerts. She claimed her age was a "big joke" at any Bank events, though she admitted she herself frequently said she would not retire until she was 100 years old, and they would have to carry her out of the workplace.

In July 2016, Downes transferred to a different market and no longer supervised Castro. He had no interaction with her after his transfer, and had no involvement in her discharge or the investigation preceding it. Thereafter, Sai Savant became Castro's supervisor. Respondent Brian Jones was Castro's second-level supervisor. Castro claimed that Jones also asked her why she was not using the iPad and, when Castro explained that her RA prevented her from doing so, he responded, "'Oh, so you're missing sales opportunities.'" Castro alleged that "[e]very time" senior management visited her financial center, they would ask her why she was not using the iPad and she would explain about her RA. Castro was never disciplined for not using the iPad, and the issue never arose in her performance reviews.

Also working at the Tarzana center was Michael Sanchez, who at the time of the incident held the title of Market Sales Manager and managed the personal bankers. Castro testified at deposition that Sanchez had said to her a

few times, "'I don't know how you're able to do this. Look how swollen your hands are.'"

## B. *The Incident*

On September 14, 2016, Castro, Eugene Karachun (a relationship manager working at the Tarzana center), and three other employees were meeting in an office, regarding a dispute Karachun and another employee were having. Video footage of this meeting shows that approximately six minutes into the meeting, Castro emerged from behind the desk in the room and walked toward the door. Before she reached it, she turned around, approached an employee, and waved her fist at her. She then turned toward Karachun and waved her fist in his direction.[3] Karachun then left the room. After a pause, Castro walked toward the door and, upon reaching it, fell to the ground. While the footage contained no audio, Castro alleged that in response to a request to spit out his gum, Karachun responded, "It's always got to be your way or fuck off."

## C. *The Investigation*

Two days later, Castro reported the incident to advice and counsel, the Bank's equivalent of a human resources department. Castro also reported other concerns regarding

---

[3] While Castro claimed she could not form a fist and the Bank did not dispute this, we have reviewed the video footage and Castro's hand does, indeed, appear to be balled into a fist. In any event, the video depicts Castro twice raising her hand in a threatening gesture.

6

Karachun's conduct and attendance and stated she feared him. The matter was assigned to Elisa Bain (an employee relations manager who had conducted or been involved in employee investigations for the Bank for over 20 years) and Mikael Andersson (a security manager who had been with the Bank for nine years). Bain was to investigate whether Karachun had violated Bank policy, and Andersson was to investigate whether Karachun posed a safety threat.

On September 20, 2016, Bain and Andersson called Castro to interview her. Castro appeared frustrated and asked Bain (to whom she had not previously spoken), "'How many more times was I gonna say this story?'" Bain later testified that it took a long time to calm Castro down sufficiently to answer questions; Castro initially claimed to be a Senior Vice President and challenged why she was being questioned. She eventually informed Bain that Karachun was often under the influence of alcohol, was frequently late, used racist and antigay slurs, made a comment about "easy access" in reference to a coworker's skirt, dated customers, and used profanity. The Bank placed Karachun on administrative leave pending an investigation.

Bain interviewed several employees regarding Castro's allegations, including Karachun himself. When interviewed on September 20, 2016, Karachun alleged Castro had been abusing and bullying the employees in the center. Specific allegations included that she threatened his job and pitted employees against each other. She called male employees "'pussy'" and a female employee "'fat,'" comparing her to

7

Jabba the Hut. She taunted an employee for previously calling advice and counsel to complain about her. She also mocked elderly customers. Based on Karachun's allegations, as well as the video footage showing Castro's threatening gestures, Bain and Andersson opened an investigation into Castro as well.

On September 22, 2016, Savant (Castro's supervisor) telephoned Castro and asked her to come to a meeting; Castro became upset and stated she could not come because she had a doctor's appointment. Castro expressed frustration at being interviewed again, and her husband came on the line to yell at Savant.[4] The next day, the Bank placed Castro on paid administrative leave.

Bain interviewed more than a dozen employees in her investigation of Castro. In the interviews, she was told that Castro:

> –constantly called an employee "fat ass," and called other employees "bitch" and "pussy"
>
> –suggested an employee get a "lap band" because of her weight
>
> –called a teller "stupid" and insinuated employees were not smart enough to do their jobs

---

[4] Castro claimed she told Savant to call her if she wanted Castro to come in after her doctor's appointment, but that Savant never called.

–told one employee she lacked common sense and could not speak English

–commented on an employee's body during pregnancy

–mocked elderly customers

–raised her hands in anger, pointed her finger in employees' faces, and grabbed employees' arms when angry

–was accusatory regarding sick time and questioned the legitimacy of an employee's bereavement leave when the employee's father died

–pitted employees against each other

–used profanity

–disclosed other employees' personal information

–did not consistently treat employees in a respectful manner

–became emotional and defensive when a peer, who had heard about a "not good" environment, had attempted to discuss concerns with her

–gave an employee a hard time about changing clothes after he was asked to move furniture, when moving furniture was not part of his job duties

9

–potentially attempted to influence one employee's testimony regarding Karachun by reminding him that Karachun had "punched" him months earlier (in his own interview, the employee described the punch as playful, not violent)

Castro did not dispute the employees made these statements but noted that several of them also praised her, and/or denied seeing or suffering any abuse. She also noted she had previously reported three of those interviewed (Christine Torres, Regina Sarfati, and Jena Takvoryan) for improper sales practices.[5] However, several employees who were not the subject of Castro's reports -- Monica Alonzo, Marissa Robeson, Raphael Gallardo, Mandana Bourbour, and Michael Sanchez -- also said negative things regarding

---

[5] The parties disputed whether Jones, who made the ultimate decision to terminate Castro, was aware of these reports. In a declaration submitted in opposition to the Bank's motion for summary judgment, Castro alleged she specifically told Jones of these improper sales practices. In her deposition testimony, however, she failed to name Jones as among the individuals she had informed of the improper sales practices. In December 2016, Castro asked Jones's assistant to set up a meeting between her and Jones, because she had decided to "go higher up regarding [her] concerns," something she had not yet done.

Castro's behavior.[6]  Castro testified at deposition that if the allegations made about her were true, her termination would have been appropriate.

[6]     Alonzo stated that Castro commented on the size of her belly when she was pregnant, which Alonzo did not appreciate. Alonzo also said she sometimes felt verbally abused by Castro, who made her feel that she did not know what she was doing or was not smart enough for the job.  She was afraid to call in sick because Castro would make comments to other employees that they did not look sick.  Alonzo reported that Castro would use profanity, comment on other employees (e.g. telling an employee to be careful around another employee, because the employee would call HR), and grab employees when upset.  Alonzo did not complain about the abuse because she feared losing her job. Alonzo believed other employees felt similarly.

Robeson stated Castro told her in front of others that Robeson lacked common sense.  She had seen Castro raise a fist to other employees, and believed Castro needed to control her temper and would benefit from anger management.

Gallardo stated Castro had reminded him before the interview of the time when Karachun had punched him on the shoulder.  Gallardo, too, said that Castro used profanity.

Bourbour stated she "absolutely [did] not" get the support she needed from Castro, and that Castro "absolutely [did] not" demonstrate the Bank's "role model behaviors" or treat all employees equally with dignity and respect.

Sanchez stated there was tension in the center and relayed one incident at which he was present when Karachun told Castro he felt harassed and retaliated against, and Castro began crying and saying it might be time for her to retire.  Castro also claimed people were trying to "gang up" on her.

11

After the employee interviews, Bain believed she had the information she needed, and had a "high level of confidence" that the allegations regarding Castro were true. Bain found it significant that the first time she interviewed some of the employees (about Castro's allegations regarding Karachun), their testimony "somewhat protected" Castro, and it was not until the second interview that they revealed their issues with Castro's behavior; Bain believed this evidenced a lack of bias because these employees did not know there would be a second interview.[7] Taking into account the evidence she had already collected, Castro's frustration when Bain had originally called her to speak about Karachun, Castro's subsequent refusal to come in for a meeting when Savant had called to request one, and Castro's husband's outburst at Savant during that call, Bain chose not to interview Castro. Bain testified in deposition that there was no value in interviewing Castro because of the "overwhelming amount of evidence to support her poor leadership skills." Bain opined she had "never seen a situation quite like this one where we had such an overwhelming amount of evidence regarding Ms. Castro's behavior."[8]

---

[7] Though Castro's allegations regarding Karachun were the focus of the initial interviews, Bain believed her questions "were broad enough to see if there was other additional behaviors [*sic*] in the center."

[8] Castro testified to her belief that the Bank had a policy to always interview the employee being investigated because in her

(*Fn. continued on the next page*.)

**D.    *Disciplinary Actions***

Regarding Karachun, Bain believed several allegations (that he had used profanity and engaged in horseplay and inappropriate behaviors such as blowing "canned air" on a co-worker) were substantiated but many others (that he had been under the influence, made an "easy access" comment in reference to a co-worker's skirt, or used racist or antigay slurs) were not.  The Bank disciplined Karachun with a written "policy reminder," advising him of what behaviors were appropriate.  He was not fired.

The Bank decided to fire Castro.  It claimed to have made this decision on October 14, 2016.  However, before the termination could be carried out, Castro requested medical leave and the Bank decided to grant the request and proceed with the termination after Castro's return.  Castro disputes this, pointing to an entry made in the Bank's Siebel

---

time at the Bank, her "experience was that you have to coach your associate.  You have to give them an opportunity to state their side.  It is not -- you don't just take one side; you speak to everyone."  Bain testified that "[i]t was our practice that I would have talked to [Castro] maybe in some form in the -- I mean at some point in the investigation.  As I told you in this case, we did not.  And there was a reason why."  Even had the Bank failed to follow its own procedures, that would not signify that the true motive was discriminatory.  (See *Arnold v. Dignity Health* (2020) 53 Cal.App.5th 412, 430 (*Arnold*) [assuming employer failed to follow its policies and procedures, summary judgment proper when plaintiff failed to present evidence supporting rational inference that discrimination was true reason for employer's actions].)

13

computer system (wherein Bain, per her usual practice, had entered her notes regarding the Karachun and Castro investigations) dated October 17. This entry contained "talking points" for a call with Castro, in which Castro was to be asked to meet with Jones and Bain. The talking points stated that if Castro asked whether she should resign, Jones would respond that this would be her decision, but that her resignation would be accepted. However, if Castro refused to meet, then she would be told the Bank "will need to make decisions based on the information we have and as such her employment will be terminated effective immediately" and that "[f]ailure to cooperate in an investigation is a COC violation." It is undisputed that before anyone had such a call with Castro, she requested and was granted medical leave to undergo shoulder surgery.

Castro returned to work on January 23, 2017. That morning, she met with Savant and Andersson, with Jones on the phone. Jones informed Castro the Bank was terminating her employment because it had lost trust in her leadership. Castro's replacement was a healthy male in his 30s.

In explaining the differences in the discipline between Karachun and Castro, Misha Boyd-Harris, a human resources manager, testified at deposition that: "Castro was the leader in that financial center, therefore as the leader she sets the tone and the culture. So as the leader -- and the relationship manager [Karachun] is a subordinate. The relationship manager was not term[inat]ed because if there were behaviors unbecoming of a leader that were egregious

14

in nature and that sets the tone, then we would not terminate the subordinate."

## E.    *Castro's Suit*

In June 2017, Castro filed a complaint against the Bank, Jones, and Downes, alleging four causes of action: (1) discrimination on the basis of age, gender, and disability in violation of the Fair Employment and Housing Act (FEHA); (2) termination in violation of public policy; (3) intentional infliction of emotional distress; and (4) failure to accommodate.  In December 2017, Castro filed a first amended complaint, which is the operative complaint, adding a cause of action for retaliation in violation of Labor Code section 1102.5.  The individual defendants were named only in the cause of action for intentional infliction of emotional distress; the Bank was named in every cause of action.  All defendants answered the operative complaint.

## F.    *Summary Judgment Motion and Ruling*

In July 2018, respondents moved for summary judgment or, in the alternative, summary adjudication. Castro opposed the motion, respondents replied, and the motion was heard and taken under submission in September 2018.  The court subsequently issued a 13-page order granting the motion.  The portions relevant to this appeal are summarized below.

The court first set forth the general legal principles: "'In employment discrimination cases under FEHA, plaintiffs can prove their cases in either of two ways: by

direct or circumstantial evidence.'"  It then delineated the three-part test used in California:  "'"(1) The complainant must establish a prima facie case of discrimination; (2) the employer must offer a legitimate reason for his actions; (3) the complainant must prove that this reason was a pretext to mask an illegal motive"'"" and addressed each cause of action.

1.    **First Cause of Action for Discrimination in Violation of FEHA**

Regarding the first cause of action for discrimination on the bases of age, gender, and disability, the court found Castro had made a prima facie showing only as to age discrimination.  Regarding gender discrimination, the court found the only evidence Castro presented was that she was replaced by a man, and "[t]hat simply is not enough to support a claim of gender discrimination."  Regarding disability discrimination, the court found Castro had failed to show she had suffered an adverse employment action because of her disability.  The court found that regardless of any animus evidenced by Downes's comments toward Castro, it was undisputed that Downes played no part in the investigation of Castro or her termination.  Additionally, Jones's comment that Castro was missing sales opportunities by not using the iPad, the fact that Castro had to explain to senior management about her RA "every time" they visited, and Sanchez's comment about her swollen

16

hands and that he did not know how she could "do this," did not constitute evidence of animus based on disability.

The court found the Bank's investigation into Castro had uncovered "a plethora of events, including what [the Bank] accurately describes in its points and authorities as 'bullying' and [']cruel, unprofessional, and controlling behavior.'  The behavior included name calling ('fat ass', [']bitch', 'stupid', 'pussy'); mocking of elderly customers; disrespectful comments to employees; grabbing employees by the arm when she was upset; disclosing private information; and questioning the need for bereavement leave."  The court further found the "findings were reported on and discussed" and "[t]he decision was made to terminate Plaintiff from employment" but "[b]efore the termination could be carried out, Plaintiff requested and was granted a medical leave."  The court found the Bank had established nondiscriminatory reasons for the termination.

The court reiterated that Castro had failed to make a prima facie showing of gender and disability discrimination and had presented "no evidence that her age was discussed or taken into account by" those who fired her.  The court noted that "[t]he establishment of a prima facie case, without more, is insufficient to show a discriminatory motive, a necessary fact to show pretext."

The court further determined that Castro had failed to raise a triable issue of fact that the Bank's proffered reasons for terminating her employment were pretextual.  The court noted that "[t]he fact that the investigation may not have

17

been perfect, or that one or more of the interviewed employees may have had a grudge against Plaintiff, does not establish discriminatory intent. . . . [A]t most it 'would give rise to an inference that the employer had other unstated reasons for the termination, but it would not necessarily give rise to a reasonable inference that Employer's motivation was illegal.'" Recognizing the Bank had not interviewed Castro during its investigation, the court found the Bank had no obligation to do so. Thus, the court concluded Castro had failed to establish a triable issue of fact as to the first cause of action.

### 2. Second Cause of Action for Termination in Violation of Public Policy

The court found the Bank was entitled to summary adjudication on the second cause of action because it was based on the same facts as the first cause of action.

### 3. Third Cause of Action for Retaliation in Violation of Labor Code Section 1102.5

Noting it was illegal for an employer to retaliate against an employee for disclosing information to a person with authority over her if the employee had reasonable cause to believe the information disclosed a violation of state or federal statute, the court found Castro had established a prima facie case for retaliation because she had presented evidence of reporting improper sales practices to Jones, who

18

was the individual who ultimately fired her.  However, the court noted that "as described at length above, Plaintiff was terminated for legitimate, nondiscriminatory reasons, and there is no evidence to support any inference that this was [*sic*] one report was the basis for the termination."

### 4. Fourth Cause of Action for Intentional Infliction of Emotional Distress

The court noted that the first element for a cause of action for intentional infliction of emotional distress was "'extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress.'"  The court concluded the comments made by Downes and Jones did not "rise to the level of extremity and outrageousness required to support" this cause of action.

### 5. Fifth Cause of Action for Failure to Accommodate

The Bank argued that Castro received all accommodations she requested or needed.  Castro disagreed, arguing she was not "fully accommodated" because instead of providing an alternative to the iPad used for directing customer traffic, Jones accused her of missing sales opportunities.  She also claimed the Bank once conducted a "surprise visit" of the Tarzana center on a Thursday when Castro was typically at doctor's appointments, "in an attempt to sandbag her."

19

The court found Castro's claims did "not relate to any particular accommodation which she claims was denied, but instead suggest[ed] that (a) she was accused of being slow because of her accommodation and (b) her medical absences were used as opportunities to build a case against her. Such allegations do not fit within the rubric of a claim for failure to accommodate. They may form part of the basis for a disability or harassment claim, but even if true, they are not evidence of a failure to accommodate."

The court entered judgment in November 2018. Castro timely appealed.

## DISCUSSION

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.] Under California's traditional rules, we determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).)

20

## A. *Discrimination in Violation of FEHA*

### 1. Principles of Law

"California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination, including age discrimination, based on a theory of disparate treatment." (*Guz, supra*, 24 Cal.4th at 354.) "Generally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Id.* at 355.) Once the employee satisfies this burden, "the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to 'raise[] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason."[9] (*Id.* at 355-356.) "If the employer sustains this burden, the presumption of discrimination disappears. [Citations.] The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." (*Id.* at 356.)

---

[9] "Legitimate" reasons are those "*facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding of *discrimination*." (*Guz, supra*, 24 Cal.4th at 358.)

"A defending employer seeking summary judgment in a discrimination case may meet its burden by showing that one or more of these prima facie elements is lacking, or that the adverse employment action was based on legitimate nondiscriminatory factors." (*Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1038.) An employer is also entitled to summary judgment "if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz, supra,* 24 Cal.4th at 361.) "To defeat the motion, the employee then must adduce or point to evidence raising a triable issue, that would permit a trier of fact to find by a preponderance that intentional discrimination occurred." (*Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1098.)

"The ultimate issue when discriminatory discharge is alleged is what the employer's true reasons were for terminating the employee." (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1524 (*McGrory*).) "[A]n employer need not have good cause to terminate an at-will employee. The reason for termination need not be wise or correct so long as it is not grounded on a prohibited bias." (*Ibid.*) "Logically, disbelief of an Employer's stated reason for a termination gives rise to a compelling inference that the Employer had a different, unstated motivation, but it does not, without more, reasonably give rise to an inference that the motivation was a prohibited one." (*Id.* at 1531-1532.) "Unless at-will

22

employers are to be held to a good-cause standard for termination, no inference of discrimination can reasonably be drawn from the mere lack of conclusive evidence of misconduct by the employee." (*Id.* at 1533.)

Additionally, while discrimination may be proven circumstantially, the "'[c]ircumstantial evidence of "'pretense' must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate" on an improper basis.'" (*Batarse v. Service Employees Internat. Union, Local 1000* (2012) 209 Cal.App.4th 820, 834.)

### 2. The Court Did Not Err in Granting Summary Adjudication as to Castro's FEHA Claim

In a single cause of action Castro alleged that her termination constituted discrimination on the bases of age, gender, and disability in violation of FEHA. In ruling on the Bank's motion, the court found Castro had made a prima facie showing of age discrimination, but had failed to make one regarding gender or disability. The court further found the Bank had produced sufficient evidence to establish a nondiscriminatory reason for firing Castro, and that Castro failed to present sufficient evidence to raise a triable issue of fact whether the Bank's reasons were false or pretextual. Castro contends the court erred in finding: (a) she failed to make a prima facie showing regarding gender and disability

23

discrimination; and (b) she failed to establish a triable issue of fact with respect to pretext.

### (a) Castro Failed to Make a Prima Facie Showing Regarding Gender and Disability Discrimination

Castro contends the court erred in finding she failed to make a prima facie showing because the prima facie burden is light, and because the court impermissibly resolved disputes of fact against her. We disagree. "While the plaintiff's prima facie burden is 'not onerous' [citation], he [or she] must at least show "'actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion . . . .""" (*Guz, supra*, 24 Cal.4th at 355.)

Regarding gender discrimination, Castro contends she met her burden by showing she was a woman and her replacement was a man. Our Supreme Court has stated that to make a prima facie showing of discrimination based on age, gender, or disability, a plaintiff must show that "some other circumstance suggests discriminatory motive." (*Guz, supra*, 24 Cal.4th 317 at 355.) Castro cites no authority holding the mere fact that a terminated employee's replacement is of a different gender qualifies as a circumstance suggesting a discriminatory motive.

Regarding disability discrimination, a plaintiff demonstrates a prima facie case "by presenting evidence

24

that demonstrates, even circumstantially or by inference, that he or she (1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability. [Citation.] To establish a prima facie case, a plaintiff must show "'''"actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion . . . .'"''''" (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 310.) Castro argues she "more than cleared" this hurdle by submitting evidence of the comment from Jones about missing sales opportunities by not using the iPad, and the comment from Sanchez about her swollen hands. We disagree. Jones's comment can only reasonably be interpreted as a concern that sales opportunities were being missed because Castro was not using the iPad -- a concern she addressed by using her computer. Castro admitted she was never disciplined for not using the iPad, nor was it ever raised in a performance review. Sanchez's comments can only reasonably be construed as evidencing concern for Castro's wellbeing and/or admiration for her ability to work with swollen hands. Even without further explanation from the Bank, no reasonable factfinder could infer from these two pieces of evidence that Castro's termination was motivated by animus

based on her disability. "Light" as the burden may be to make a prima facie showing, Castro failed to meet it.

Moreover, it is unclear what facts Castro now contends the court impermissibly resolved against her. The Bank did not dispute that she was replaced by a healthy male, or that Jones and Sanchez made the statements Castro alleged. In its ruling, the court acknowledged that Castro's replacement was male and that Jones and Sanchez made the alleged remarks. The court made no mention that Castro's replacement was not disabled, but nothing in the record indicates it found otherwise. We find the court did not impermissibly resolve these facts against Castro, and agree Castro failed to make a prima facie case for gender or disability discrimination.[10]

### (b) Castro Failed to Raise a Triable Issue of Fact Regarding Pretext

The court found the Bank had proffered evidence of a nondiscriminatory reason for the termination. Castro does not dispute this, but argues the court erred in finding she had not demonstrated the existence of triable issues of material fact whether the Bank's proffered reasons were false or pretextual.

---

[10] In any case, the court found the Bank proffered legitimate reasons for Castro's termination and Castro does not contend otherwise. Because we, like the trial court, conclude Castro failed to raise a triable issue whether the Bank's proffered reasons for firing her were false or pretextual, it would be irrelevant whether Castro had made these prima facie showings.

26

Castro first argues the trial court erroneously believed she was required to provide direct evidence of discrimination. The record demonstrates otherwise. The court's ruling expressly recognized that "'[i]n employment discrimination cases under FEHA, plaintiffs can prove their cases in either of two ways: by direct or circumstantial evidence.'" When the court later found "no evidence that [Castro's] age was discussed or taken into account by the decision-makers," nothing in the record indicates the court's use of the word "evidence" referred only to "direct" evidence. "We presume the trial court knew and properly applied the law absent evidence to the contrary." (*McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1103.)

Castro next argues she demonstrated triable issues of material fact by presenting: (i) evidence that the reasons the Bank proffered for investigating her in the first place were false; (ii) evidence that the investigation was not fairly conducted; (iii) evidence that the results of the investigation did not support the conclusions that led to her termination; (iv) evidence that Karachun was investigated and disciplined in a significantly different way than Castro; and (v) other evidence indicating the Bank's animus toward her age and disability. We address each contention in turn.

### (i) Initiation of the Investigation

Castro argues that, because she was a 5-foot tall, 66-year-old woman who suffered from rheumatoid arthritis and was unable to form a fist, she could not possibly be a safety threat. Therefore, the Bank's decision to investigate whether she was a safety threat based on a video of her supposedly shaking her fist at Karachun raised a triable issue of fact whether the Bank's reasons were false or pretextual because the investigation itself was begun on a pretext. We disagree.

We have reviewed the video and it clearly shows Castro shaking a clenched hand in a threatening manner at two employees. Moreover, no evidence in the record demonstrates that when the investigation was begun, Bain or Andersson had any knowledge that Castro suffered from RA or claimed an inability to form a fist. Thus, no reasonable factfinder could have concluded that the Bank's reasons for firing Castro were false or pretextual because it lacked any basis for investigating whether she was a safety threat.

### (ii) Conduct of the Investigation

Castro complains the investigation was unfair because the Bank chose not to interview her in violation of its policy to always interview the affected employee, and because it refused to gather or consider exculpatory evidence.

28

### *Interviewing Castro*

As to the Bank's alleged policy to interview affected employees, Castro points to two pieces of evidence: her own testimony that "you have to coach your associate. You have to give them an opportunity to state their side. It is not -- you don't just take one side; you speak to everyone"; and Bain's testimony that "[i]t was our practice that I would have talked to [Castro] maybe in some form in the -- I mean at some point in the investigation. As I told you in this case, we did not. And there was a reason why."

We find Castro's testimony irrelevant -- the Bank did not employ her as an investigator, and her testimony relates to how a manager resolves issues among employees, not how the Bank investigates employees accused of violating Bank policy. Bain's testimony, read in the light most favorable to Castro, established that an investigator would typically talk to the affected employee, but that it was not a Bank policy that such an interview *must* occur. Moreover, after the Bank began investigating Castro, Savant attempted to meet with her, but she refused to come in for the meeting, citing a doctor's appointment.[11] In any case, as an at-will employee, Castro had no right to a hearing or to be informed of the

---

[11] Castro's claim that she offered to come in after the appointment if Savant called her creates no triable issue of material fact. Assuming she made such an offer, Savant's original request that Castro come in for a meeting is undisputed evidence the Bank was not intentionally refusing to meet with her.

29

allegations against her.  (See, e.g., *McGrory*, 212 Cal.App.4th at 1536 ["As to the investigation being flawed and biased, Employee complains that he was not informed of the charges against him by Employer or [the investigator].  But he cites no provision of his employment contract or employment law in general entitling an at-will employee to advance notice and a hearing before termination"].)  On this record, no reasonable factfinder could conclude from the Bank's failure to interview Castro that the reasons for terminating her were false or pretextual.

### *Exculpatory Evidence*

Castro also claims the Bank refused to gather exculpatory evidence, refused to consider the effect of Castro's reporting three of the employees interviewed for improper sales practices, and ignored the fact that Castro's disability rendered it impossible for her to form a fist or grab employees.

Castro provides no factual support for her contention that the Bank refused to gather exculpatory evidence, and indeed, she herself demonstrates otherwise.  In her appellate brief, Castro points out that several of the interviewed employees praised Castro and denied seeing or suffering abuse.  Castro's knowledge of these statements comes largely from the notes Bain entered into the Bank's Siebel system -- demonstrating the Bank did in fact gather "exculpatory evidence."

As to the fact that Castro had reported three of the employees for improper sales practices, there is no evidence Bain was aware of such reports and in any case, several employees who were not subjects of Castro's reports -- Alonzo, Robeson, Gallardo, Bourbour, and Sanchez -- also gave statements attesting to Castro's improper behavior.

Bain did become aware of Castro's RA during the investigation but regarding the extent of any impairment, Bain testified to having viewed the same video footage that we have viewed -- where Castro is clearly seen raising her hand in a threatening manner at two employees. Castro has failed to raise a triable issue of material fact as to whether the investigation was conducted fairly.

### (iii) The Results of the Investigation

The trial court found the Bank had presented evidence of "a plethora of events, including what [the Bank] accurately describes in its points and authorities as 'bullying' and cruel, unprofessional, and controlling behavior. . . . The behavior included name calling ('fat ass', [']bitch', 'stupid', 'pussy'); mocking of elderly customers; disrespectful comments to employees; grabbing employees by the arm when . . . upset; disclosing private information; and questioning the need for bereavement leave." These are self-evidently legitimate reasons for firing Castro.

Castro argues she raised triable issues of material fact whether the Bank's proffered reasons were pretextual

31

because "[w]ithin the notes taken by [the Bank]'s investigators there is simply no evidence of 'significant mistreatment' of employees, or that Plaintiff was bullying employees. Rather, the evidence demonstrates that Plaintiff was, broadly speaking, providing the support needed by [the Bank]'s employees, and was exhibiting [the Bank]'s role model behavio[r]s." Castro is mistaken. Within the notes taken by the Bank's investigators there is ample evidence of significant mistreatment and bullying of employees. For example:

–Monica Alonzo stated Castro made comments about the size of her stomach when she was pregnant and sometimes made her feel incompetent, but she was afraid to speak up because she thought she would be fired. Alonzo also reported Castro would question her sick leave (i.e., you don't look so sick) and stated employees were scared of Castro. Castro shared other employees' confidential information, yelled at customers, used profanity, and called a teller stupid. Castro would also wave her hands around when upset, point fingers in employees' faces, and sometimes grab employees.

–Marissa Robeson said Castro scolded her, told her she lacked common sense, and joked she did not understand English. Robeson believed Castro could use anger management classes.

–Mandana Bourbour stated she "absolutely [did] not" get the support she needed from Castro,

32

and that Castro "absolutely [did] not" demonstrate the Bank's "role model behaviors" or treat all employees equally with dignity and respect.

Castro spends several pages of her opening brief pointing out that some employees praised Castro or reported no mistreatment or bullying. But such statements do not contradict the statements of those who did report or experience mistreatment, and therefore do not give rise to a reasonable inference that the Bank did not believe Castro had mistreated at least some of her employees.

Finally, Castro explains that she submitted a declaration denying she abused or bullied her employees. But the trial court was not considering whether there was a triable issue of material fact whether Castro actually behaved as the Bank alleged. "In demonstrating that an employer's proffered nondiscriminatory reason [for terminating an employee] is false or pretextual, '[an employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. . . . Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' . . . and hence infer 'that the employer did not act for the [asserted]

33

non-discriminatory reasons."'"" (*Sandell v. Taylor-Listug, Inc.*, *supra*, 188 Cal.App.4th at 314.) Castro's denial of wrongdoing does not demonstrate weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered reasons such that a reasonable juror could find those reasons "unworthy of credence."

### (iv) The Investigation and Treatment of Karachun

Castro argues that the difference between how she (an older, disabled female) and Karachun (a young, able-bodied male) were investigated and disciplined constitutes circumstantial evidence of discrimination because the Bank interviewed Karachun as part of its investigation and, although it substantiated some of the allegations against him, punished him with only a written "policy reminder." In contrast, the Bank did not interview Castro as part of its investigation and fired her.

"To establish discrimination based on disparate discipline, it must appear 'that the misconduct for which the employer discharged the plaintiff was the same or similar to what a similarly situated employee engaged in, but that the employer did not discipline the other employee similarly.' [Citation.] What appears here is that Employee was a manager while [the other employees] were his subordinates. Further, [the investigator] concluded that they engaged in some different conduct. . . . 'Different types and degrees of

34

misconduct may warrant different types and degrees of discipline . . . .' [Citations.] No inference of discrimination reasonably arises when an employer has treated differently different kinds of misconduct by employees holding different positions." (*McGrory*, *supra*, 212 Cal.App.4th at 1535-1536.) As the Bank's human resources manager Boyd-Harris testified at deposition: "Castro was the leader in that financial center, therefore as the leader she sets the tone and the culture. So as the leader -- and the relationship manager [Karachun] is a subordinate. The relationship manager was not term[inat]ed because if there were behaviors unbecoming of a leader that were egregious in nature and that sets the tone, then we would not terminate the subordinate." Because Castro and Karachun were not similarly situated, the differences in their investigation and discipline raise no inference of pretext.

### (v)  Other Alleged Evidence of Pretext

Finally, Castro argues she demonstrated pretext by showing that the Bank decided to terminate her shortly after she asked for medical leave, there was a culture of discrimination at the Bank, and Jones told her she was missing sales opportunities after she stated she could not use an iPad due to her disability.

35

### *Temporal Proximity*

"Pretext may be inferred from the timing of the discharge decision . . . ." (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 224.)  Castro argues she raised a triable issue of material fact whether the Bank decided to fire her before or after she requested medical leave in October 2016.  The Bank contends the evidence showed the decision to fire Castro occurred before she requested medical leave.

In granting the Bank's motion, the court resolved this dispute in favor of the Bank.  Castro challenges this resolution, pointing to an October 17 entry in the Bank's Siebel computer system listing talking points for a conversation with Castro, asking her to come in for a meeting, and stating that, should Castro refuse, she would be told that the Bank "*will* need to make decisions based on the information we have and as such her employment *will* be terminated effective immediately."  (Italics added.)  It is undisputed this conversation did not occur before Castro requested medical leave.  We therefore find there was sufficient evidence to raise a triable issue whether the Bank decided to terminate Castro before or after her request for medical leave.

But while this conclusion could potentially have affected the determination whether Castro had made a prima facie showing of disability discrimination -- an argument Castro does not make and that we therefore do not address -- it would have made no difference to the ultimate outcome of the motion.  Even had the Bank decided to fire

36

Castro after her request for medical leave to undergo shoulder surgery, Castro herself testified that, prior to October 2016, she had taken time off from work for no fewer than five surgeries since 2011, and had had no issues with how the Bank handled her departure and return for those surgeries. Other than temporal proximity, no evidence linked the sixth surgery to the Bank's decision to fire Castro. As Castro herself recognizes, "temporal proximity . . . does not, without more, . . . satisfy the secondary burden borne by the employee to show a triable issue of fact on whether the employer's articulated reason was untrue and pretextual." (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1112.)

### *Culture of Discrimination*

Castro alleges she presented evidence of a "culture of discrimination," pointing to the comments from Downes and others. However, Castro cites no authority permitting the requisite animus to be imputed to the employer based on remarks made by individuals uninvolved in the adverse employment action. (See, e.g., *Arnold*, *supra*, 53 Cal.App.5th at 427-428 [age-related comments made by some of plaintiff's supervisors insufficient to defeat summary judgment when those supervisors were not materially involved in plaintiff's termination].) The sole remark attributed to anyone involved in Castro's termination was Jones's statement that Castro was missing sales opportunities because she was not using the iPad. We find this remark insufficient to establish

that the Bank's true reason for firing Castro was impermissible animus.

### *Inability to Use iPad*

Finally, Castro argues that Jones's remark regarding missing sales opportunities is "direct evidence" that his actual motivation in firing her was her disability. We disagree. As explained above, we find the remark does not constitute either direct or indirect evidence of such animus.

Castro cites to three cases -- *Lindahl v. Air France* (9th Cir. 1991) 930 F.2d 1434 (*Lindahl*); *Cordova v. State Farm Ins. Companies* (9th Cir. 1997) 124 F.3d 1145 (*Cordova*); and *Sischo-Nownejad v. Merced Community College Dist.* (9th Cir. 1991) 934 F.2d 1104 (*Sischo-Nownejad*) -- none of which assist her. In *Lindahl*, the Ninth Circuit found that comments indicating a supervisor might have promoted a male over a female due to stereotypical beliefs regarding men and women, combined with several other factors indicating the promoted male was less qualified than the unpromoted female plaintiff, raised a genuine issue of fact precluding the granting of summary judgment. (*Lindahl*, 930 F.2d at 1438-1439.) We fail to see how a statement that Castro was missing sales opportunities evidences any sort of the stereotyping discussed in *Lindahl*.

In *Cordova*, the Ninth Circuit held that "[c]alling someone a 'dumb Mexican' is an egregious and bigoted insult, one that constitutes strong evidence of discriminatory animus on the basis of national origin." (*Cordova, supra,*

38

124 F.3d at 1149.)  Similarly, in *Sischo-Nownejad*, the Ninth Circuit held that referring to a plaintiff as "'an old war-horse'" and to her students as "'little old ladies'" and making other derogatory remarks indicating age and gender bias (such as making "sarcastic remarks regarding 'you women's libbers'"), while at the same time subjecting the plaintiff to less favorable working conditions, was sufficient to raise an inference of discriminatory intent.  (*Sischo-Nownejad*, *supra*, 934 F.2d at 1108, 1112.)  Both examples are a far cry from Jones's remark to Castro.  No reasonable factfinder could have concluded that Jones's remark was direct evidence of his bias against Castro.

## B. *Termination in Violation of Public Policy*

The court found the Bank was entitled to summary adjudication on Castro's cause of action for termination in violation of public policy for the same reason it was entitled to summary adjudication on Castro's first cause of action for discrimination in violation of FEHA.  On appeal, Castro argues this was erroneous because she presented sufficient evidence to raise a triable issue of material fact whether the Bank's proffered reasons for her termination were false or pretextual.  As discussed above, she did not.

## C. *Retaliation*

As with her claim of age discrimination, the court found that while Castro had made a prima facie showing of retaliation, she had failed to raise a triable issue of material fact whether the Bank's proffered reasons were false or

39

pretextual. On appeal, Castro makes two arguments. First, as with her first two causes of action, she argues the court erred in finding she failed to raise a triable issue of material fact regarding the Bank's reasons. We have disposed of that argument above.

Second, Castro argues she raised issues of fact whether the employees whose allegedly improper sales practices she reported harbored retaliatory animus toward her, which animus should be imputed to the Bank. However, Castro cites no authority permitting the bias of a fired employee's subordinates to be imputed to the employer; the cases she cites -- *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95 (*Reeves*) and *Poland v. Chertoff* (9th Cir. 2007) 494 F.3d 1174 (*Poland*) -- hold only that in some circumstances, the bias of an employee's supervisor may be imputed to the employer.

In *Reeves*, the court held that if a "supervisor annoyed by a worker's complaints about sexual harassment" decided to "get rid of that worker by, for instance, fabricating a case of misconduct, or exaggerating a minor instance of misconduct into one that will lead to dismissal" and "[a]nother manager, accepting the fabricated case at face value" fired that employee "entirely without animus . . . [i]t would be absurd to say that the plaintiff in such a case could not prove a causal connection between discriminatory animus and his discharge." (*Reeves*, *supra*, 121 Cal.App.4th at 108-109.) But *Reeves* was careful to emphasize that only a supervisor's animus that could be so imputed: "Our

40

emphasis on the conduct of *supervisors* is not inadvert. An employer can generally be held liable for the discriminatory or retaliatory actions of supervisors. [Citation.] The outcome is less clear where the only actor possessing the requisite animus is a nonsupervisory coworker." (*Id*. at 109, fn. 9.)

In *Poland*, the Ninth Circuit held that "if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process." (*Poland*, *supra*, 494 F.3d at 1181.) But the "subordinate" referenced was the fired employee's supervisor -- he was a "subordinate" of the ultimate decisionmaker. (*Id*. at 1177, 1182.) Castro does not cite, and we have not found, any authority permitting animus felt by her subordinates to be imputed to her employer.

### D. *Intentional Infliction of Emotional Distress*

The court found that the comments made regarding Castro's age and disability did not rise to the level of "extremity and outrageousness required to support" a cause of action for intentional infliction of emotional distress. We agree. On appeal, Castro does not address this holding;

41

instead she argues that "[g]iven that triable questions of fact exist whether [the Bank] engaged in discrimination and retaliation, triable questions of fact remain regarding Plaintiff's claim [of] Intentional Infliction of emotional distress and are not preempted by workman's compensation." As we conclude there are no triable issues of fact whether the Bank engaged in discrimination and retaliation, her claim necessarily fails. The Bank is entitled to summary adjudication on this claim.

### E. *Failure to Accommodate*

In opposing summary judgment, Castro claimed that, contrary to the Bank's arguments, she had not been "fully accommodated" because: (1) rather than providing her with an alternative to the iPad used to direct customer traffic, Jones accused her of missing sales opportunities; and (2) the Bank conducted a "surprise visit" of her financial center on a Thursday when it was known that Castro was typically at a doctor's appointment. The trial court found Castro's claims "do not fit within the rubric of a claim for failure to accommodate," and therefore granted summary adjudication on that cause of action. On appeal, Castro does not argue the court erred in doing so. We therefore affirm the trial court's grant of summary adjudication as to Castro's fifth cause of action for failure to accommodate.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICAL REPORTS**


MANELLA, P. J.

We concur:


COLLINS, J.


CURREY, J.


43